# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

FILED
DISTRICT COURT
DISTRICT OF MARYLAND

LOUIS BATTY,

      Petitioner

      v.

JAMES V. PEGUESE, WARDEN, et al.

      Respondents

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

2005 JUL 29 P 3: 51

CLERK'S OFFICE
AT GREENBELT

Civil No. JFM-03-335

# SUPPLEMENT TO PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

Petitioner Louis Batty, through counsel, Michael E. Lawlor and Sicilia Chinn

Englert, Lawlor & Englert, LLC, files this Supplement to Petition for Writ of Habeas

Corpus Pursuant to 28 U.S.C. § 2254.

## I. INTRODUCTION

Corey Gaksins, the sole State witness in the trial of Louis Batty who could

implicate Batty in the shooting death of Maurice Booker, testified at Batty's trial

pursuant to an agreement with the State of Maryland for some remuneration

consisting of aid from the State with multiple pending charges in exchange for his

testimony against Mr. Batty.  Gaskins was arrested on January 25, 1995 for the

unlawful possession of a handgun.  His arrest occurred about one and half months

after the shooting of Mr. Booker.  At that time, Gaskins indicated to police, while in

SCANNED

custody, that Mr. Batty had informed him that he was the individual who shot Mr. Booker on the evening of December 13, 1994. Gaskins said that Batty told him this about three days after the shooting, but Gaskins was unsure of the time or place of Batty's supposed admission. Gaskins only advised the police of Batty's supposed confession at the time of his arrest.

Gaskins had further discussion with the police on February 27, 1995, this time pertaining to two robberies that Gaskins had committed with several other suspects on Christmas Eve, 1994. Gaskins fully admitted to his involvement in the two armed robberies during that meeting with police. Notwithstanding this confession to two armed robberies, and the State's claim that they had promised Gaskins no assistance with his robbery charges (save a recommendation of credit for time served), Gaskins would plead guilty after the conclusion of Batty's trial to reduced charges and an insubstantial sentence that amounted to no sentence at all.

Notwithstanding volumes of evidence presented at Mr. Batty's State Post-Conviction hearing indicating that the police and State had offered Gaskins assistance with his robbery charges in exchange for his testimony against Mr. Batty, the State Post-Conviction Court dismissed Mr. Batty's allegation that the State violated *Brady v. Maryland* in withholding this critical information, with a single sentence claiming

that he had presented "no evidence" of the true nature of the deal between the State and Gaskins.

A writ of habeas corpus is warranted in this case because the State withheld from the defense the true nature of the deal between the State of Maryland and Corey Gaskins and because the State court's short-shrift disposal of the claim misrepresented the facts as presented at the State Post-Conviction hearing.

## II. PROCEDURAL HISTORY

Following a jury trial held from February 9 - 22, 1996, in the Circuit Court for Baltimore City (the Honorable Kenneth L. Johnson presiding), Petitioner was found guilty of first-degree murder, unlawful use of a handgun in a felony or crime of violence, and unlawful wearing, carrying, and transporting a handgun.

On April 29, 1996, Petitioner was sentenced to life imprisonment for first-degree murder. The remaining two gun convictions merged, for which he received a sentence of 20-years, consecutive to the life sentence.

On February 10, 1997, the Court of Special Appeals affirmed the convictions in an unreported opinion, *Batty v. State*, No. 838, September Term, 1996 (filed February 10, 1997). On May 7, 1997, the Court of Appeals of Maryland denied Petitioner's Petition for Writ of Certiorari.

On February 1, 1998, Petitioner filed, pro se, a Petition for Post-Conviction Relief in the Circuit Court for Baltimore City.   On November 10, 1998, still proceeding pro se, Petitioner filed an amended petition.  Thereafter, on February 18, 2000,  counsel for Mr. Batty filed an Amendment to Petition for Post-Conviction Relief.  A hearing on the Post-Conviction petition was held in the Circuit Court for Baltimore City on April 4-9, 2001, before the Honorable Joseph P. McCurdy.  On March 28, 2002, the Circuit Court for Baltimore City denied the Petition for Post-Conviction Relief.

On November 25, 2002, the Court of Special Appeals of Maryland Denied Petitioner's Application for Leave to Appeal from the Denial of Post-Conviction Relief.

On February 3, 2003, Petitioner filed pro se a Petition for Writ of Habeas Corpus pursuant to § 2254 in this Court.   Following the filing of an Answer by Respondents, on February 14, 2005, this Court issued a Memorandum and Order denying some of the claims in the Petition, but ordered that a claim of prosecutorial misconduct would remain pending and three other claims would be held in abeyance. Undersigned counsel was appointed by separate Order of this Court on the same day.

## III. THE STATE'S EVIDENCE AT TRIAL

On December 13, 1994, at approximately 8:44 p.m., Maurice Booker was shot and killed while driving his car at the intersection of Lucille and Beaufort Avenues in Baltimore City. Two months later, Petitioner was arrested for the murder after Corey Gaskins was arrested in an unrelated matter and, in seeking leniency for his own cases, told police that Petitioner was responsible for the Booker murder. Gaskins advised police that he was not sure of when Petitioner had advised him of his involvement in the Booker shooting, but that it was approximately three days after the shooting. Gaskins only reported this to police on the day he was arrested for his unlawful possession of a handgun.

The State would proceed to trial in this matter with Corey Gaskins as the sole witness who would implicate Mr. Batty in the shooting of Maurice Booker. In fact, it might be argued that the State would do more to prove Mr. Batty's innocence in this case than his guilt, inasmuch as the State called a witness, Larry Mankley, who would testify that Mr. Batty was two blocks from Booker's car at the time he was shot. In sum, the State's evidence against Petitioner consisted of the following:

Booker's six-year old brother, Luvelle Booker, was in the car at the time of the shooting and testified that two masked people dressed in black shot his brother.

(Trial Transcript "Tr." 2/20/96 p. 127). Luvelle, naturally, could not identify the shooters.

Irene DeGross, who lived at 3502 Lucille Avenue, one house from the corner of Lucille and Beaufort Avenues, testified that she was going next door to her mother's house (two doors from the corner), when she noticed two guys standing on the corner of Lucille and Beaufort dressed in black. (Tr. 2/13/96 pp. 10-11). After she was in her mother's house for five or ten minutes, she heard about nine gunshots. She testified that she ran to the door and saw two guys running up Lucille Avenue and into 3522 Lucille, a house on the same side of the street as the witness's home. (Tr. 2/13/96 p. 12). DeGross testified that she was familiar with 3522 Lucille Avenue because there were parties there every Friday. (Tr. 2/13/96 p. 13).

Notwithstanding the testimony of Ms. DeGross and the State's theory that the two gunmen ran into the home of Sharon Walker, Batty's girlfriend, the State called Damesia Walker to testify. Ms. Walker testified that she lived at 3522 Lucille Avenue with her sister, Sharon Walker, and a friend named Veronica Dixon. Damesia confirmed that at some point, Petitioner had dated her sister, Sharon. (Tr. 2/13/96 pp. 46-47). She also stated that she was home at the time of the shooting and heard multiple gunshots. (Tr. 2/13/96 p. 49). However, the doors to her house were locked and she had the only key, and she testified that Mr. Batty did not come into her

6

house after the shooting. (Tr. 2/13/96 p. 50). The State also called Sharon Walker

to testify. She advised the court that she stopped dating Petitioner in November or

December 1995, and she was not at home at the time of the shooting. (Tr. 2/13/96 p.

57).

Cheron Jennings, who also lived in the neighborhood where Mr. Booker was

shot, testified that Mr. Booker was her sister's boyfriend and lived at their house on

3520 Woodland Avenue. (Tr. 2/14/96 pp. 87-88). On the day in question, Booker

instructed her to say that he was not at home if anyone came looking for him. (Tr.

2/13/96 p. 91). Jennings noted Petitioner came to the house at about 7:00 p.m. and

Booker told him to come back at 9:00 p.m. (Tr. 2/14/96 p. 90). Also, another man

named Little Charles [Charles Robinson] twice came to the house looking for Booker.

(Tr. 2/14/96 p. 90). Shortly after the shooting, Petitioner came to her house looking

for Booker, whereupon Jennings told Petitioner that Booker had been shot. (Tr.

2/14/96 p. 96). Jennings testified that Petitioner gave her a hug and she could feel

that he was wearing a bullet proof vest. (Tr. 2/14/96 p. 97-98).

Corey Gaskins, testifying pursuant to an agreement with the State, testified that

three days after the Booker murder, Petitioner told him the following:

A:    He said he had went by Chink's [Booker's] house earlier that day
      and Chink had told him to come back.
Q:    An then what?

7

A:    He said when he came back the second time, Chink was pulling off, and he said he ran through the alley and tried to catch him.

Q:    Then what happened?

A:    He said he reached for the handle, the driver's handle, and Chink grabbed his wrist and the gun went off.

Q:    Hitting Chink where?

A:    In the head.

Q:    And then what did he do?

A:    He said so he had to finish him off because he thought Chink might have recognized him.

(Tr. 2/14/96 pp. 158-59).

Q:    And in addition, you told the Detective when you - Detective Requir, when you talked to him, that when - the type of gun that Bud [Batty] allegedly used was a Tech 9. Is that your testimony sir?

A:    Yes.

Q:    And that's a 9 millimeter gun, is that correct?

A:    Yes.

(Tr. 2/16/96 p. 7). Gaskins also testified that he had seen Petitioner with a Tech 9 on

previous occasions. (Tr. 2/16/96 p. 27).

Larry Mankley was called by the State to testify. Mr. Mankley lived on 4731

Reisterstown Road, three doors from Lucille Avenue. (Tr. 2/14/96 p. 115-16).[1] At

the time of the Booker shooting, Mankley was on his front porch when he saw

Booker driving on Reisterstown Road and make a right turn on Lucille Avenue. (Tr.

---

[1] Reisterstown and Beaufort Avenue run parallel, with Lucille connecting the two. The corner of Lucille and Beaufort, where Mr. Booker was shot, is approximately two blocks from the corner of Reiserstown and Lucille. (See attached Exhibit A).

2/14/96 p. 117).  At that time, Petitioner was standing on the corner of Reiserstown and Lucille with several people, including Juanita Broadway (Hawaii), Andrea Farmer (Sweet Pea) and Little Harold.  (Tr. 2/14/96 p. 117).  A few seconds later, he heard gunshots and Little Harold and Sweet Pea or Hawaii ran toward Lucille Avenue.  (Tr. 2/14/96 p. 117-18).  Mankley testified that Petitioner was wearing a burgundy Timberland jacket.  (Tr. 2/14/96 p. 130-31).

State witness Steven Faust testified that he was standing on the corner of Virginia and Reisterstown Avenues, two blocks away from the shooting when he heard gunshots.   (Tr. 2/16/96 p. 79-80).  Faust answered a phone call at a phone booth from his cousin who told him that someone got shot. (Tr. 2/16/96 p. 80).  Faust then took about five to ten minutes to get to the scene where he saw Petitioner in a crowd of people, dressed in a black leather coat with a bicycle.   (Tr. 2/16/96 pp. 80-81).  Faust testified that before the shooting, he saw Petitioner riding his bike on Virginia and Reisterstown Avenues.  (Tr. 2/16/96 pp. 82-83).  Faust testified that he saw the Petitioner wearing a leather coat that was different from the black jacket that the State admitted into evidence.   (Tr. 2/16/96 p. 85).[2]

---

[2] This jacket, introduced by the State into evidence, was seized from Mr. Batty at the time of his arrest in February, 1995.

# IV. ARGUMENT

**A.    Standard of Review Governing a Petition for Habeas Corpus**

The standard by which a federal court reviews a petition filed pursuant to

28 U.S.C. § 2254 is codified at 28 U.S.C. § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved
> > an unreasonable application of, clearly established Federal
> > Law, as determined by the Supreme Court of the United
> > States; or
> >
> > (2) resulted in a decision that was based on an
> > unreasonable determination of the facts in light of the
> > evidence in the State court proceeding.

A state court's factual determinations are presumed correct, but the

presumption may be rebutted by clear and convincing evidence. *See Tucker v.*

*Ozmint*, 350 F.3d 433, 439 (4th Cir. 2003).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court addressed the

proper standard of review to be applied by federal courts in assessing petitions for

habeas corpus relief filed by a state prisoner.  The majority, addressing first the

"contrary to" language of §2254(d)(1), noted that a state court judgment would be

contrary to clearly established federal law if the state court, for example, applied the

wrong legal standard in judging a claim of ineffective assistance of trial counsel or

denied relief in a case that was factually indistinguishable from a prior holding of the

Supreme Court. *Williams*, 529 U.S. at 405.   For example,

> [i]f a state court were to reject a prisoner's claim of ineffective assistance
> of counsel on the grounds that the prisoner had not established by a
> preponderance of the evidence that the result of his criminal proceeding
> would have been different, that decision would be diametrically
> different, opposite in character or nature, and mutually opposed to our
> clearly established precedent because we held in *Strickland* that the
> prisoner need only demonstrate a reasonable probability that. . . the
> result of the proceeding would have been different.

*Id.* at 405-406. *See also Rose v. Lee*, 252 F.3d 676, 689 (4th Cir. 2001) (state court's

application of incorrect burden of proof on ineffective assistance of counsel claim

was "contrary to" clearly established Supreme Court law.).

Next addressing the "unreasonable application" language of the statute, the

Court held that "when a state-court decision unreasonably applies the law of this

Court to the facts of a prisoner's case, a federal court applying §2254(d)(1) may

conclude that the state-court decision falls within that provision's 'unreasonable

application' clause." *Williams,* 529 U.S. at 409. The Court next sought to define the

exact meaning of an "unreasonable application of clearly established Federal law."

The Supreme Court held that:

> Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.

*Williams*, 529 U.S. at 409-10. Stated another way, the Court held that a federal habeas court may grant a writ of habeas corpus "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."[3]

For the reasons discussed below, the decision of the State Post-Conviction Court is both contrary to and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, namely the decisions of the Supreme Court in *Brady v. Maryland* and its progeny. The State Court's decision was also represents and unreasonable application of the facts. As such, this Court should grant a writ of habeas corpus.

**B.    The State Post-Conviction Court's Conclusion That There Was "No Evidence" to Support Petitioner's Claim That The State Withheld Favorable Impeachment Evidence Was Contrary To Or Involved An Unreasonable Application Of Established Supreme Court Law, per §2254(d)(1)**

In State Post-Conviction proceedings, Petitioner contended that the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by

---

[3] Petitioner does not concede that the State court identified the correct legal standard since the court disposed of Petitioner's claim in one sentence without identifying *any* legal standard at all.

withholding from the defense the full extent of its agreement with Corey Gaskins, the

key State's witness.  To prevail on a *Brady* violation, Petitioner must show that:

> (1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material.

*Spicer v. Roxbury*, 194 F.3d 547, 555 (4th Cir. 1999) (citing *Strickler v. Green*, 527

U.S. 263, 280 (1999)).

The State Post-Conviction Court disposed of Petitioner's prosecutorial

misconduct claim in one sentence: "there was no evidence of anything other than the

actual plea agreement made between the State and Corey Gaskins and that was

disclosed." (Memorandum of Judge Joseph P. McCurdy, Circuit Court for Baltimore

City, March 28, 2002 ("Post-Conviction Memorandum") (Habeas Corpus "HC"

Exhibit No. 22), pp. 5-6).   The State Post-Conviction Court's summary disposition

of this issue is incorrect and failed to even acknowledge the substantial evidence of

an agreement between Gaskins and the State of Maryland that was not disclosed to

the defense.  Taking the three prongs of the *Brady* analysis out of turn, it is clear that

the State concealed the true nature of its agreement with Gaskins from the defense,

that this information was favorable to the defense, and that, had the information been

disclosed, there is a reasonable probability that the outcome of Batty's trial would have been different.

## 1.    The State Concealed the Full Terms of its Agreement with Gaskins, the Prosecution's Key Witness

Contrary to the State Post-Conviction Court's ruling, there was compelling evidence that the State made promises of leniency to Gaskins that were deliberately concealed from the defense. Gaskins was arrested on January 24, 1995 in Baltimore City and charged with a handgun violation. While detained, Gaskins approached police officers claiming that he was willing to provide information on the Booker homicide in exchange for leniency on his charges. Petitioner was arrested some time thereafter. At Mr. Batty's trial, the State acknowledged that upon his arrest on January 24, 1995, Gaskins sought help with his pending charges in exchange for information on the Booker murder. At the time of his arrest on the handgun charge, Gaskins also had a pending charge pertaining to his escape from home monitoring in Baltimore County, Maryland. It was the State's position that Gaskins made a statement about Petitioner's involvement in the Booker murder after police told him that they could make no promises but would bring his cooperation to the attention of the State's Attorney's Office. Several months later, in June 1995, Gaskins was charged in the District Court of Maryland for Baltimore City in a more serious case, with two counts

of armed robbery.[4]  The State maintained that in exchange for Gaskins's testimony, it made no promises with respect to the armed robbery case other than to recommend that he receive credit for any time served on the handgun and home monitoring charges.    The State introduced into evidence at Petitioner's trial a written Memorandum of Understanding dated January 22, 1996 ("Memorandum Agreement").[5]  Petitioner's trial, as noted, commenced on February 8, 1996.  The Memorandum Agreement, signed by Assistant State's Attorney Carolyn Starks-Saxon, Detective Oscar Requer, and Gaskins, memorialized in writing that no promises were made to Gaskins on the handgun charge and that he was promised no benefit on his armed robbery charges other than a recommendation of credit for time served.  At Petitioner's trial, Detective Requer and Gaskins both testified that the Memorandum Agreement encompassed  the entire agreement.[6]

---

[4]  Although Gaskins was charged in the District Court, the case was not forwarded to the Circuit Court for Baltimore City until July of 1996 and he did not enter his plea until November, 1996.  As noted, Gaskins gave a full written confession to these robberies on February 27, 1995.  His confession is attached hereto as Exhibit B.

[5]  This Memorandum, State Post-Conviction Exhibit No. 5, was filed in this Court by letter to the Clerk from Ann N. Bosse, Esquire, dated November 23, 2004.

[6]  Although the Memorandum of Understanding is dated January 22, 1996 (only approximately two weeks prior to Mr. Batty's trial) it was not turned over to defense counsel until February 5, 1996.  Two Supplemental Discovery Disclosures

Detective Requer testified that shortly after his arrest on January 25, 1995, Gaskins gave information on the Booker murder in exchange for leniency on the Baltimore County handgun and home monitoring charges.  Requer testified:

Q:    And when he asked - when you spoke to him, what did he say he wanted from you in return for information?

A:    He wanted help on his charges he had in Baltimore County.

Q:    And he had been arrested that night for what kind of charge?

A:    I believe it was a handgun.

Q:    Possession of a handgun?

A:    Yes ma'am.

Q:    And his charges in Baltimore County were what?

A:    He was charged with violating the home monitor.  He was on home monitor in Baltimore County.

Q:    And when he asked for that, what was your response?

A:    Myself and Detective Brown, who was present during this interview, told him myself and Detective Brown could not make any promises as to any pending charges against you.  However, we will bring your cooperation to the attention of the State's Attorney's office for their consideration.  Do you understand this. He said, yes, he understood it.

Q:    And based on that, did he proceed to talk to you?

---

were provided to defense counsel pursuant to her request for information regarding Gaskins's deal with the State.  See attached Exhibit C.

A:    We asked him was he still willing to talk to us after we made that clear and he said yes, and he gave us a statement.

Q:    All right.  At that time you spoke to him, were there any other charges or any other agreement at that time you spoke to him?

A:    None.

Q:    And he gave you a full statement right then, is that correct?

A:    That is correct.

(Tr. 2/14/95 pp. 36-37).

With respect to the Memorandum Agreement, Detective Requer testified:

Q:    Now, after that time did there come a date on January 22nd, 1996, that you had a meeting with him, myself, and Corey Gaskins?

A:    Yes ma'am.

Q:    And at that time did we write a formal memorandum of understanding?

A:    We did.

             . . . .

Q:    Okay.  Now by the time we spoke to him, did he have a detainer for an additional charge?

A:    Yes, he did.

Q:    What was the additional charge?

A:    Armed robbery.

Q:    Did we make any promises to him regarding the additional armed
      robbery charge other than what is contained in that note?

A:    None at all.

Q:    I want you to read - and is this document the full understanding
      between the State, yourself and Corey Gaskins regarding his
      testimony?   The answer for the record is what?

A:    Yes.

(Tr. 2/14/96 pp. 38-39).

At Petitioner's trial, Gaskins similarly denied that he had any expectation of

leniency on the armed robbery charges in exchange for his testimony.   On cross-

examination, Gaskins testified:

Q:    The pending robbery charge, to help with your pending charge you
      have with Baltimore City, the robbery charge, robbery with a
      dangerous and deadly weapon.  You wanted help for that charge
      so in exchange for their helping you with that particular charge,
      you were going to come in here and testify, is that correct?

A:    No, ma'am.

(Tr. 2/14/96 p. 161-62).  Gaskins testified that at the time he signed the Memorandum

Agreement, he only wanted to resolve the escape and handgun charges and that he

expected no assistance with the armed robbery charges.  (Tr. 2/16/96 p. 16).  The State

elicited the following testimony from Gaskins:

Q:    Now, at the time that you first talked to Detective Requir, did you
      have any robbery charges?

18

A:    No.

Q:    Ms. Shelton asked you about, oh you don't want to have 20 years for robbery when you gave this statement.  Was that true?

A:    No.

Q:    Why wasn't it true?

A:    Because I didn't have a robbery charge pending.

Q:    Okay, you gave the statement to homicide in January of 1995, when you talked to Detective Requir, is that correct?

A:    Yes.

Q:    When did you find out you had robbery charges pending?

A:    June.

Q:    Of what year?

A:    Last year.

**Q:    And those robbery charges are not in any way relative to your agreement to testify, is that correct?**

**A:    No.**

. . . .

Q:    When you talked to Detective Requir about these charges did you even know about the robbery charge?

A:    No.

Q:    Okay.  So your talking was conditional on him helping you with which charges?

19

A:     My handgun charge and my home monitor charge.

Q:     How in any way is the time that you're spending in Baltimore
       County supposed to affect the robbery deadly weapon charges?

A:     It is not.

Q:     Are you going to get credit on the charges here in the city for the
       time that you're spending in Baltimore County?

A:     Possibly. Possibly not.

Q:     But did we make any deal, other than any credit you might get
       while you were sitting there, on the robbery deadly weapon
       charge?

A:     No.

(Tr. 2/16/96 pp. 16-18) (emphasis added). The State made clear that any possible

leniency pertained exclusively to the handgun and escape from home monitoring

charges. The only benefit to Gaskins in his armed robbery case was limited to

receiving credit for time served while in jail in Baltimore County. With respect to his

understanding of credit for time served, Gaskins testified on cross-examination:

Q:     Now, Mr. Gaskins, in exchange for your testimony, the State
       indicated in the agreement that you signed that you will be given
       credit for time served in Baltimore County on the robbery charges
       in Baltimore City from the date the robbery detainer was filed in
       Baltimore County.

       Isn't it true that your understanding for credit for time served
       means that when you finish testifying, when that matter comes up,
       **the State's Attorney will recommend to the judge holding that**

> **particular case that give him time served and you could be released from jail.  Is that correct?**
>
> A:    **No.**
>
> Q:    That's not your understanding of time served?
>
> A:    No.
>
> Q:    What is your understanding, sir?
>
> A:    If they give me time then I will have time in on my charge.

(Tr. 2/14/96 pp. 164-65) (emphasis added).

The State took great pains to make sure the jury understood that in exchange for his trial testimony, Gaskins in no way expected to benefit with respect to his armed robbery charges other than a recommendation that he receive credit for time already served on the handgun and home monitoring cases.  Detective Requer further testified that at the time of the January 22, 1996, agreement, Gaskins had already served all of his time on the home monitoring charge, (Tr. 2/14/96 p. 41), thus indicating that Gaskins had nothing to gain on his escape from home monitoring case.

The Memorandum Agreement itself was executed in anticipation of Petitioner's trial, for the purpose of showing the jury and the defense that Gaskins was not testifying in exchange for leniency on his armed robbery case.  On cross-examination, Detective Requer testified:

Q:    And so in order to ensure Mr. Gaskins' cooperation, you wanted
       to put this in writing so that he could have that reassurance so he
       could testify, is that correct?

A:    No, that's not correct.

Q:    That's not one of his conditions for -

A:    That's not correct. The reason we did that was to make it perfectly
       clear to you and the Judge and everything our agreement with him,
       and that's why we reduced it to writing, so there's no mistake what
       we agreed to.

(Tr. 2/14/96 p. 49).

    After Petitioner was convicted, a far different understanding of the terms of his

agreement with the State emerged. Gaskins wrote several letters to Detective Requer

and Michael Montemarano, his attorney in the armed robbery case, showing that he

understood perfectly that the police and the State would officially "make no promises"

so that he would be a more credible witness in front of the jury in Petitioner's trial.

At the same time, however, they assured him that things would be "o.k." In a letter

dated May 2, 1995, Gaskins wrote to Detective Requer:

    I have a release date out here in Towson for September 14, 1995. They
    are waiting for me to finish up with the murder case until they sentence
    me on the Escape from Home-monitor charge. I also went to Wabash
    today and they postponed it until June 22 . . . **Det. Requer I remember
    you saying don't worry about the charge at Wabash but they acted
    like they new nothing about my situation but I still hold to your
    word.**

22

(Gaskins letter to Det. Requer, May 2, 1995) (emphasis added). In another letter to

the Detective, Gasksins wrote:

> I'm writing concerning my charge at Wabash for the handgun. **I no you
> didn't promise me anything but you said take your word, everything
> will be okay**. So that's what I'm doing. Det. Requer **I'm not new to
> this and I do no a little bit about the law**.

(Gaskins letter to Det. Requer, June 22, 1995) (emphasis added). [7] Although officially,

the police officers made no promises other than to bring Gaskins's cooperation to the

State's Attorney's Office, he was given a "wink and a nod" not to worry about the

handgun charge.[8] Despite having copies of Gaskins's letters to Requer, the State never

produced any evidence showing that it disabused Gaskins of this expectation.

The Memorandum Agreement stated that, with respect to the handgun

possession and violation of home monitoring charges, the police had promised to bring

Gaskins's cooperation to the attention of the State's Attorney for possible lenient

treatment on those charges. The agreement, however, memorialized no such promise

either from the police or from the State's Attorney with respect to the armed robbery

---

[7] Gaskins's letter to Detective Requer dated March 3, 1995 was previously filed with the Clerk by Respondents. Gaskins's letters to Detective Requer dated May 2, 1995 and June 22, 1995, as well as his letter dated June 19, 1995, are attached hereto as Exhibit D.

[8] Gaskins did receive plenty of benefit with his handgun case as those charges were ultimately placed on the Stet docket.

charge. According to the agreement, the State's involvement in the armed robbery case was limited to recommending that Gaskins receive credit for time served on the other cases. At the guilty plea hearing on Gaskins's armed robbery charges, however, the State admitted that it had promised to tell the court adjudicating the armed robbery case that Gaskins had cooperated in Batty's trial. The prosecutor, Ahmet Hisim, informed the court:

> Ms. Saxon . . . wrote a memo to the file telling me in the memo basically that Mr. Gaskins did a great job for the State, that we are really happy about his testimony, but we didn't make any deals with him other than **we would tell the court that he did a great job for the State**. It's my understanding from Mr. Montemarano that that was not his understanding of the deal.

(Transcript of Gasksins Guilty Plea (provided to the Court by Respondents on November 23, 2004) "Gaskins Tr." 11/26/96 p. 4) (emphasis added). Despite its adamant assertion that there were no promises outside the agreement, the State admitted it agreed to aid Mr. Gaskins in at least one way not contained in the agreement - by bringing Gaskins's cooperation to the attention of the court in the armed robbery case.

The evidence in the State Post-Conviction Court record goes even further, however, showing that in exchange for his testimony, Gaskins expected the armed robbery charges to be dropped or that he would serve no additional time (not merely

credit for time served as stated in the Memorandum Agreement and as he testified in Petitioner's trial).[9]

Gaskins wrote several letters to his attorney, Michael Montemarano, showing that he expected the robbery charge to be dropped in exchange for his testimony in Petitioner's trial. In a letter dated August 19, 1996, Gaskins wrote:

> My fiancee knows everything about what's going on. She was talking to Detective Requer and State's Attorney Carolyn Saxon and they told her things were going to be o.k. and Det. Requer said I would be home this year 1996 and Det. Writz was going to drop the charges because of my help on the murder.[10]

(Gaskins letter to Montemarano, August 19, 1996). In another letter dated September 6, 1996, Gaskins wrote:

> The only thing I will take is time served from when I first got locked up or no time at all. The Det's told me and my fiancee that they were going to drop the charges. It seems like they are playing games.

---

[9] This Court's Memorandum framed this issue in terms of the State's failure to disclose an agreement that Gaskins would not be charged for armed robbery (Memorandum, p. 24). Petitioner has maintained, however, that the State failed to disclose an agreement, express or implied, that in exchange for his trial testimony, Gaskins would benefit from lenient treatment on the armed robbery charge beyond that contained in the State's Memorandum Agreement. Specifically, that the charges would be dropped or that he would receive a sentence of time served. The issue, therefore, is not limited to the question of whether or not the State merely promised to refrain from charging Gaskins with armed robbery.

[10] Detective Ritz (correct spelling) is the officer who took Gaskins's robbery confession.

25

(Gaskins letter to Montemarano, September 6, 1996).[11] Gaskins plainly believed that, as a result of his testimony at Petitioner's trial, that he would not serve any additional time in the armed robbery case. This directly contradicted his testimony at Mr. Batty's trial when he testified that he was receiving no benefit in the robbery with deadly weapon case other than possibly a recommendation of **credit** for time served. In his letter to Mr. Montemarano, however, Gaskins said that he would accept no more than a **sentence** of time served, and he fully expected to be home in 1996.

Gaskins himself said that he was not new to the criminal justice system. At trial, he understood clearly that the State wanted the jury to think that in exchange for his testimony, he would receive no benefit on the robbery with deadly weapon charge except a recommendation of credit for time served. At a minimum, Gaskins's letters to Detective Requer and Mr. Montemarano show that there was at least a wink and nod deal that the State would take care of him in the handgun case and that his armed robbery charges would go away or at the most, he would not have to serve any additional time. At the adjudication of Gaskins's armed robbery case, the events played out consistently with Gaskins's understanding that, in exchange for his testimony against Batty, he would be treated favorably on the armed robbery charges.

---

[11] These two letters from Gaskins to Mr. Montemarano were provided to the Court by Respondents on November 23, 2004.

Under Maryland State sentencing guidelines, Gaskins faced seven to thirteen years of imprisonment for each of the two robbery with deadly weapon counts. (Gaskins Tr. 11/26/96 p. 13). The handgun charge alone carried a minimum sentence of five years without parole. (Gaskins Tr. 11/26/96 p. 41). Mr. Montemarano summarized the tacit agreement as follows:

> MR. MONTEMARANO: He was told, quote, we don't want to put in the agreement what we are giving you because the defense will learn about it, and we don't want them to know. He was the reason the homicide resulted in a life plus thirty, I believe, or life without parole plus thirty; real numbers, Judge.

(Gasksins Tr. 11/26/96 p. 4-5). The Assistant State's Attorney prosecuting Gaskins's armed robbery case, Ahmet Hisim, was pressured by the victims and their families to seek a period of additional imprisonment, (Gaskins Tr. 11/26/96 p. 9), and argued that the Memorandum Agreement did not show that the State intended to drop the armed robbery case:

> MR. HISIM: The only thing I have, information about any deal, are a memo from Ms. Saxon and Detective Requer, who said they would come in and testify. **Now, I do have to say that Ms. Saxon did want the court to know that if it wasn't for Mr. Gaskins, she wouldn't have gotten a conviction** . . .

> MR. HISIM: Michael, there is this agreement between your client – now, it is signed by him. Is this totally bogus?

> MR. MONTEMARANO: Not at all. That just isn't all of it. It goes beyond the four corners of the document.

. . . .

> MR. MONTEMARANO:  They indicated their desire to have Mr.
> Gaskins agree to postponing sentencing in the county until the
> conclusion of the murder case in exchange for their promise, **express or
> implied**, of leniency.  In reliance on the promise of leniency, Mr.
> Gasksins (inaudible) his own pre-indictment delay.  If the State's
> Attorney and the city doesn't make Gaskins a very favorable offer, then
> he will have been prejudiced by the pre-indictment delay.

(Gaskins Tr. 11/26/96 pp. 7, 16-17) (emphasis added).

> MR. MONTEMARANO:  . . . he doesn't believe he should be getting
> convicted.  His understanding is the case was being dumped, and I don't
> consider that inconceivable . . .

(Gaskins Tr. 11/26/96 p. 26).  At one point, the court expressed its opinion that it there

would be no reason for Gaskins to have cooperated unless there was an agreement.

> THE COURT:  Why would he give himself up on a robbery, deadly
> weapon, and give up information about a homicide if there was no deal?

(Gaskins Tr. 11/26/96 p. 7).

> Later, Mr. Montemarano again summarized the events leading to the plea:

> [M]y client's understanding when he was arrested on the handgun charge
> in January of '95 and was approached by city homicide detectives about
> the murders allegedly committed by Mr. Louis, L-O-U-I-S, Batty, B-A-T-
> T-Y, so that he would cooperate with them.  He knew information, et.
> cetera.

. . . .

> His understanding is that any statements would not be used against
> him, and that he was told that this should not be reduced to writing

28

because it would be of assistance in the defense of the charges against Mr. Batty. . . .

[M]y client, therefore, waived his right to be indicted in a timely fashion. He sat until earlier this year, May I believe. His case finally did go to trial in May/June. Mr. Batty was convicted. My client did, indeed testify, and at that time was then charged with these offenses. He was not charged at any time prior to the trial of Mr. Batty. He waived pre-indictment. He had received an eighteen month sentence, credit for time served. . . . And he agreed to sit from when he entered that plea . . . My understanding is that he would have been out on the street on the Baltimore County about a year ago, and sat until the spring of '96 so that he would be a better witness . . .

(Gaskins Tr. 11/26/96 pp. 48-49).[12]

Ultimately, the State reduced the charges from robbery with deadly weapon to simple robbery with no deadly weapon, thus avoiding the mandatory minimum sentence of five years without parole.[13] The State agreed to a total sentence of two concurrent terms of seven years, with all but three years suspended and credit for 22-months of time served since January 24, 1995, followed by two years of probation. (Gaskins Tr. 11/26/96 pp. 28, 32-33).

_____

[12] Mr. Montemarano's explanation of the agreement between Gaskins and the State was also the understanding of Mr. Gaskins's lawyer in Baltimore County. See attached Exhibit E (letter from Assistant Public Defender Debra Michael to Michael Montemarano dated August 2, 1996 (State Post-Conviction Exhibit 3)).

[13] Ms. Stark-Saxon was present in the courtroom during the adjudication of Gaskins's armed robbery case. (Gaskins Tr. 11/26/96 pp. 20-21).

With a sentence of all but 36 months suspended and credit for 22 months of time served plus good time credits, Mr. Gaskins got the deal he expected, essentially time served. Since Mr. Gaskins was not even entitled to time served in the robbery case since his time in Baltimore County was pursuant to a valid sentence in that jurisdiction, Gaskins essentially received no time at all in a case involving two robberies effectuated by the use of a handgun where the State was in possession of a written, signed confession from Gaskins.

Gaskins was promised, above and beyond the terms of Memorandum Agreement, that (1) he didn't need to worry about the handgun charge (not just that his cooperation would be brought to the attention of the State's Attorney's Office), and (2) he would not serve any additional time for the two armed robbery charges. The State even admitted that it promised to bring his cooperation to the attention of the court adjudicating his armed robbery case, a benefit that was also not in the Memorandum Agreement. Given all of the information presented at the State Post-Conviction hearing, as discussed above, the State Post-Conviction Court's conclusion that there was "no evidence" of a deal between the State and Gaskins regarding his robbery case was completely unreasonable. Aside from the letters to the Detective, the letters to Mr. Montemarano, the affidavit of Mr. Montemarano (dated February 25, 2000 and attached hereto as Exhibit F), the fact that the State ultimately treated

Gaskins so favorably is evidence itself of the deal that was in place. Notwithstanding that Gaskins had confessed to two armed robberies, the State agreed to a binding plea that resulted in Gaskins serving essentially no time in prison. In the end, Gaskins received exactly what he claimed he was promised.

2.  **The Evidence Withheld by the State Was Favorable to the Petitioner and Had to be Disclosed**

To protect a defendant's due process rights, the State is constitutionally required to disclose evidence favorable to the accused where the evidence is material to guilt or punishment. *See Brady v. Maryland.* It is well settled that the prosecution's duty under *Brady* includes the obligation to disclose information useful to the impeachment of government witnesses. *See Giglio v. United States*, 405 U.S. 150 (1972). "Evidence that can be used to impeach a witness is unquestionably subject to disclosure under *Brady*." *Spicer v. Roxbury*, 194 F.3d at 556 (citing *Strickler*, 527 U.S. at 280).

Courts have also recognized that even without an explicit agreement, any type of "wink and a nod" implicit agreement violates *Brady*. *See Giglio v. United States*, 405 U.S. 150, 155 (1972) (prosecutor's duty to disclose applies to *any* understanding or agreement between the witness and the State even if the agreement or understanding is not formal or detailed); *Campbell v. Reed*, 594 F.2d 4, 7-8 (4th Cir. 1979) (if witness

31

is not aware of exact terms of the plea agreement, that only increases the incentive for the witness to try to testify pleasingly for the prosecutor).[14]

Clearly, the evidence that Gaskins had a deal with the State pertaining to his robbery case would have been favorable to Mr. Batty's defense. Gaskins was the sole State witness to implicate Batty in the Booker shooting, contrary to even the State's own evidence that Mr. Batty had an alibi at the time of the crime. While assistance with his handgun possession charge may have provided some inducement to aid the State in the Batty matter, by the time of Batty's trial, Gaskins had confessed to conspiring to commit, and then committing, two robberies with a dangerous and deadly weapon. The State could have, had they elected to pursue the Gaskins robbery case with any vigor, charged him with two counts of conspiracy (each count carrying twenty years), two counts of robbery with a dangerous and deadly weapon (each count carrying twenty years), and two counts of the use of a handgun during the commission

---

[14] *See also*, *DuBose v. LeFevre*, 619 F.2d 973, 977-79 (2d Cir. 1980)(prosecutor bound to disclose agreement to "do the right thing" for witness; prosecution cannot avoid disclosure by keeping promises of consideration general in language or tone); *Rickman v. Dutton*, 864 F. Supp. 686, 704-705 (M.D. Tenn. 1994) (prosecutor's failure to disclose implicit expectation of leniency warranted relief); *People v. Nino*, 665 N.E. 2d 847 (Ill. App. Ct. 1996) (despite witness's claim that he did not have an agreement with the State, conviction reversed for *Brady* violations because court does not have to "suspend common sense in evaluating the evidence in the record" which strongly implied a benefit for testimony against defendant).

of a crime of violence (each count carrying twenty years). Thus, Gaskins, since the

State had not yet indicted him for the crimes to which he had confessed to, could have

been facing an aggregate of 120 years' incarceration for these offense. Even leaving

aside the far fetched notion that he would get that much time, his State guideline range

was 7-13 years and the victims of the offense were apparently in court clamoring for

Gaskins's hide. The jury in Mr. Batty's case surely would have liked to have known

that by testifying against Mr. Batty, Gaskins avoided that entire unpleasant situation

and received  barely a slap on the wrist for these offenses.

### 3.    The Undisclosed Deal Between Gaskins and the State was Material

Evidence is material if there is a reasonable probability that, had the evidence

been disclosed, the result of the proceeding would have been different. *See United*

*States v. Bagley*, 473 U.S. 667, 682 (1985) (plurality opinion). In *Kyles v. Whitley*,

514 U.S. 419 (1995), the Court noted the following regarding materiality:

> Bagley 's touchstone of materiality is a "reasonable probability" of a
> different result, and the adjective is important. The question is not
> whether the defendant would more likely than not have received a
> different verdict with the evidence, but whether in its absence he received
> a fair trial, understood as a trial resulting in a verdict worthy of
> confidence. A "reasonable probability" of a different result is
> accordingly shown when the government's evidentiary suppression
> undermines confidence in the outcome of the trial.

*Id.* at 434 (internal quotations and citations omitted). *See also United States v. Martinez-Medina*, 279 F.3d 105, 126 (1st Cir. 2002) (noting that confidence in the outcome of a trial is particularly doubtful when the withheld evidence impeaches a witness whose "testimony is uncorroborated and essential to the conviction").

There can be little question that any evidence that would impeach Gaskins, the only witness to identify Petitioner as the shooter, was material to Petitioner's defense. The State's evidence against Petitioner was weak and inconsistent. According to Gaskins, Petitioner, acting alone, shot Booker accidentally with a Tech 9 handgun. Every other witness to the offense, however, testified that there were two people involved in the shooting. The victim's brother, Luvelle Booker, testified that two people dressed in black ran out of an alley and shot his brother. (Tr. 2/20/96 p. 127). Irene DeGross testified that before the shooting, she saw two guys standing on the corner dressed in black and that after the shooting, she saw two guys running. (Tr. 2/13/96 pp. 11-12). Brenda Coates similarly testified that she saw two guys standing on the corner before the shooting and she saw two guys running up Lucille Avenue after the shooting (Tr. 2/13/96 pp. 24-25).

Gaskins also stated that Petitioner told him he shot Booker with a Tech 9 and Gaskins further testified that he had seen Petitioner's Tech 9 before. Officer James Waxter, from the Baltimore City Police Firearms Identification Unit testified,

however, that the .45 caliber bullets that killed Booker physically could not have been fired from a Tech 9 gun because they were too big and would not fit into a Tech 9. (Tr. 2/20/96 p. 39). In this case, not only was Gaskins's testimony uncorroborated, it was totally inconsistent with the remainder of the State's evidence.

Also, none of the State's witnesses recalled seeing Petitioner wearing the black jacket that the State introduced at trial. State witness Larry Mankley testified that Petitioner was wearing a burgundy and white Timberland jacket. (Tr. 2/14/96 pp. 130-31, 135-36). State witness Steven Faust testified that he saw Petitioner wearing a black leather coat and that it was not the jacket introduced into evidence by the State. (Tr. 2/16/96 p. 85).

Furthermore, and perhaps most importantly, State's witness Larry Mankley testified that Batty was on standing on a corner, two blocks from where Booker was shot, with several people, at the time the shots rang out. (Tr. 2/14/96 pp. 125-26, 136, 145-46).

In this case, the State actively concealed a wink and nod agreement of leniency in Gaskins's robbery with deadly weapon case in exchange for his testimony against Petitioner. Gaskins, fully aware that the State wanted him to appear credible at Batty's trial, concealed his true expectation of leniency on the handgun and armed robbery charges. Detective Requer similarly denied that he or the State made any promises on

35

either the handgun or armed robbery case. The testimony of Requer and Gaskins at Mr. Batty's trial are belied by Gaskins's letters to Montemorano and Requer. The jury obviously convicted Petitioner based on Gaskins's testimony as Gaskins was the only witness to link Petitioner to the shooting. During deliberations, the jury asked to see Gaskins's statement, (Tr. 2/21/96 p. 52), demonstrating its interest in his testimony. Moreover, Assistant State's Attorney Starks-Saxon admitted that she would not have gotten a conviction without Gaskins's testimony/ (Gaskins. Tr. 11/26/96 p. 7).

The materiality of the impeachment evidence is clear. Gaskins's testimony against Batty was crucial to the State's case. Equally important to the defense, therefore, was all impeachment evidence against Gaskins. The State presented Gaskins as a witness who was not promised anything other than the very limited terms contained the Memorandum Agreement. Had the had the full extent of the agreement been disclosed, there is more than a reasonable probability that the result of the trial would have been different.

**C.    Alternatively, The State Post-Conviction Court's Ruling Was Based On An Unreasonable Determination Of The Facts In Light Of The Evidence Pursuant To 28 U.S.C. § 2254(d)(2)**

The State Post-Conviction Court concluded that there was "no evidence" of anything other than what was in the disclosed Memorandum Agreement. This statement fails to account for the multitude of evidence presented to the State court,

as outlined herein.  As detailed above in Section B1, there was ample evidence that the State made promises of leniency that extended beyond the four corners of the Memorandum Agreement.  First, with respect to the handgun charge, there was evidence that Gaskins was promised leniency beyond the police merely bringing his cooperation to the attention of the State's Attorney's Office for its consideration. Second, with respect to the armed robbery charges, there was evidence, in the prosecutor's own words, that she promised to bring his cooperation to the court's attention, presumably for favorable treatment.  Again, this promise exceeded the terms of the agreement that stated only that the prosecutor would recommend that Gaskins receive credit for time served from his other cases.  Third, there was evidence that the State further promised Gaskins that he would not have to serve any additional time on his armed robbery charges.  In light of all the evidence put before the State Post-Conviction Court, the court's conclusion that there was "no evidence" of undisclosed promises was an unreasonable determination of the facts in light of the evidence.

## V.  CONCLUSION

For the foregoing reasons, as well as those submitted by Mr. Batty in his *pro se* pleadings, as well as those reasons supplied following additional discovery in this matter (should the Court grant Petitioner's discovery request), a writ of habeas corpus is warranted.

Respectfully submitted,

Michael E. Lawlor
Sicilia Chinn Englert
Lawlor & Englert, LLC
6305 Ivy Lane
Suite 704
Greenbelt, Maryland 20770
301.474.3404

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of July, 2005, a copy of the foregoing Reply Brief of Appellant was mailed, postage prepaid, to Edward J. Kelly, Esquire, Office of the Attorney General, Criminal Appeals Division, 200 Saint Paul Place, Baltimore, Maryland 21202.

Michael E. Lawlor