IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

CIVIL ACTION NO. JFM-03-335

_____

LOUIS BATTY

Petitioner

v.

JAMES V. PEGUESE, WARDEN, et al.

Respondents

_____

RESPONSE TO SUPPLEMENTAL PETITIONS
FOR WRIT OF HABEAS CORPUS

_____

J. JOSEPH CURRAN, JR.
Attorney General of Maryland

EDWARD J. KELLEY
Assistant Attorney General
Bar No. 27039

Office of the Attorney General
Criminal Appeals Division
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-7964 (telephone)
(410) 576-6475 (telecopier)

Counsel for Respondents

TABLE OF CONTENTS

STATEMENT OF RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

REASONS FOR DENYING RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     A.    Batty's Claims That The Prosecution Violated *Brady* By Failing To Disclose That, In Exchange For His Testimony Against Batty, Gaskins Would Receive a Direct Benefit In His Pending Escape Case And Assistance On His Handgun Possession Charge Should Be Rejected As Both Procedurally Defaulted And Meritless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     B.    The Prosecution Did Not Fail To Disclose Leniency to Gaskins On His Armed Robbery Charges In Exchange For His Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     C.    Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LOUIS BATTY, #507566,          *

     Petitioner,             *

     v.                   *     CIVIL ACTION NO. JFM-03-335

JAMES V. PEGUESE, WARDEN, et al.,   *

     Respondents.           *

*    *    *    *    *

RESPONSE TO SUPPLEMENTAL PETITIONS
FOR WRIT OF HABEAS CORPUS

Respondents, James V. Peguese, former Warden of the Maryland House of Correction-Annex,[1] and J. Joseph Curran, Jr., the Attorney General of the State of Maryland, by undersigned counsel, hereby respond to the supplemental petitions for a writ of habeas corpus filed by counsel on behalf of Petitioner Louis Batty.  By his supplemental petitions, Batty contends that the prosecution withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose an "unspoken agreement (or agreements)" with Corey Gaskins, a prosecution witness, who testified at Batty's trial and identified Batty as the shooter of Maurice "Chink" Booker.  *See* Second Supplemental Petition at 2.  Batty's specific allegations are three-fold:

1.     The State Failed to Disclose that Gaskins Would Receive a Direct Benefit In His Pending Escape Case in Exchange For His Testimony Against Louis Batty.

---

[1] The Maryland House of Correction - Annex is now known as the Jessup Correctional Institution, and the current warden of that institution is James Smith.

2.     The State Failed to Disclose Assistance to Gaskins on His Handgun Possession Charge.

3.     The State Failed to Disclose Assistance to Gaskins on His Armed Robbery Charges.

*See* First and Second Supplemental Petitions.

To the extent Batty's claims are even reviewable in this Court, they are totally without merit.  In fact, the record fully supports the state post conviction court's determination that there was no undisclosed agreement between the State and Gaskins.  Moreover, even assuming non-disclosure of the kind Batty claims, there is no basis to believe that it would have materially effected the jury's assessment of the evidence or its verdict in this case. Accordingly, this Court should deny Batty's instant *Brady* claim without holding a hearing.

<u>STATEMENT OF RELEVANT FACTS</u>

On December 13, 2004, Maurice "Chink" Booker was driving in the neighborhood in which he lived near the intersection of Lucille Avenue and Beaufort Avenue in Baltimore City; his six-year-old brother was in the passenger seat.  Respondents' Exhibit 4 at 10, 49-50, 56, 70; Respondents' Exhibit 5 at 10.  Evidence adduced at trial showed that two masked persons dressed in black clothing emerged from an alley near this location, and one of those individuals fired several shots into Booker's car, killing Booker.  Respondents' Exhibit 8 at 127-29.  Irene DeGross testified that she observed the two assailants run directly from the crime scene into the nearby home of Batty's girlfriend, Sharon Walker.  Respondents' Exhibit 5 at 12, 58.

Several witnesses placed Batty near the scene of the crime at the time it occurred and wearing clothes that matched the clothing worn by Booker's assailants.  Respondents'

Exhibit 6 at 75-76, 90-98, 117; Respondents' Exhibit 7 at 79-85.  Relatives of Booker stated

that, on the day of the murder, Batty had visited Booker's home twice.  Respondents' Exhibit

6 at 90-98.  When Batty came the second time, it was soon after the shooting, and he was

wearing a bullet-proof vest.  *Id*.  By December 17, 1994, the lead detective, Oscar Requer,

considered Batty a suspect in the case.  Respondents' Exhibit 5 at 125-26.

On January 24, 1995, Corey Gaskins was arrested, also in Baltimore City, on an

unrelated handgun charge.  Respondents' Exhibit 6 at 36.  Gaskins, who had another

outstanding charge for escape from home monitoring in Baltimore County, requested to talk

to the police regarding the Booker homicide.  *Id*. at 36, 53.  When this meeting convened,

Gaskins stated that he would provide the police with information on the Booker homicide in

exchange for assistance on his currently pending handgun and escape charges.  *Id*.  The

police made no promises to Gaskins other than to say that his cooperation would be

communicated to the respective prosecutors.  *Id*. at 36-37.  Gaskins proceeded to tell the

police that, in a conversation between him and Batty that occurred three days after the

Booker homicide, Batty admitted to Gaskins that he shot and killed Booker.  *Id*.  Shortly

thereafter, Detective Requer obtained a warrant for Batty's arrest in connection with the

Booker homicide.  Respondents' Exhibit 6 at 37.

On February 27, 1995, Gaskins was questioned by the police in relation to separate

armed robberies of Christmas tree salesmen that occurred on December 24, 1994.  *See*

Exhibit B to Petitioner's First Supplemental Petition.  At one of these armed robberies, the

victim was killed.  *Id*.  Gaskins denied participating in the armed robbery in which the victim

was killed.  *Id*.  Gaskins did admit, however, to participating in the other earlier armed

robbery, which involved two victims, and he gave a statement to this effect. *Id*. In June of 1995, Gaskins was charged with two counts of armed robbery. Respondents' Exhibit 7 at 17.

Pending Batty's trial, Gaskins was held at the Baltimore County Detention Center. Respondents' Exhibit 6 at 38-42. In 1995, Gaskins's Baltimore City handgun charge was placed on the "stet" or inactive docket. *Id*. at 49-50, 161. In April of 1995, Gaskins pled guilty to the escape charge in the Circuit Court for Baltimore County. *See* Exhibit A to Petitioner's Second Supplemental Petition. Disposition on the escape conviction was delayed until after Batty's trial concluded. *Id*.; *see also* Exhibit E to Petitioner's Second Supplemental Petition.

Gaskins was disclosed as a State's witness in Batty's murder trial, which began on February 9, 1996. On January 22, 1996, the prosecutor, Carolyn Stark-Saxon, Detective Requer, and Gaskins entered into the following Memorandum of Understanding, which was disclosed to the defense:

> This is to confirm that Detective O. Requer and Carolyn Stark-Saxon, Assistant State's Attorney, made the following representations to Mr. Corey W. Gaskins, regarding his cooperation with the State in the case of State vs. Louis Edward Batty, case no. 195074002-04.
>
> 1. Mr. Corey Gaskins began discussions with the State regarding providing information regarding "Chink's" murder (Maurice Lewell Booker) on December 13, 1994. Mr. Gaskins was arrested on January 24, 1995, on a handgun charge by the Baltimore City Police. On that date he volunteered to provide information to the Homicide Division in exchange for leniency on his handgun charge. No promises were made to Mr. Gaskins at that point. Detective Oscar Requer, Homicide, was contacted and he spoke to him and Mr. J.T. Brown, Homicide, regarding his charges on January 25, 1995. They advised him that, "that they could not make any promises regarding any charges pending against you. We will bring your cooperation to the attention of the State's Attorney's Office for their consideration." (Ref. Statement of Corey Gaskins, dated January 25, 1995).

4

Thereafter Mr. Gaskins provided a statement to the Homicide Detectives. He was also arrested and is being held on unrelated charges by Baltimore County. He had been advised by Ms. Carolyn Stark-Saxon, Assistant State's Attorney of Baltimore City, that she will recommend to any Court Mr. Gaskins comes before in Baltimore on robbery charges that are presently pending against him, that he be given credit for time served in Baltimore County on the robbery charges in Baltimore City from the date the robbery detainer was filed in Baltimore County.

The above-mentioned representations constitute the entire agreement between Mr. Gaskins, Detective Requer and Ms. Stark-Saxon.

*See* Respondents' Exhibit 20.

At Batty's trial, Detective Requer testified that, on January 25, 1995, Gaskins, after his handgun arrest, told the police he had information on the Booker homicide. Respondents' Exhibit 6 at 35-36. Gaskins stated that, in exchange for this information, he wanted help on his handgun charge and an escape from home monitoring charge in Baltimore County. *Id*. at 35-36, 53. Detective Requer stated that no promises were made to Gaskins with regard to the charges, but that the police would notify the prosecutors of his cooperation. *Id*. at 37. Gaskins agreed to provide information on the Booker homicide under these conditions. *Id*. Batty was charged with Booker homicide a few days later. *Id*.

Detective Requer stated that the memorandum of understanding was executed on January 22, 1996, "so there's no mistake what we agreed to." *Id*. at 49. When this agreement was signed, Gaskins's armed robbery charges were pending in Baltimore City. *Id*. at 38. Detective Requer stated that no promises were made with regard to these charges. *Id*. at 39. Although Detective Requer believed Gaskins's escape charge had been resolved, he noted that, at the time of Batty's trial, Gaskins was still being housed in the Baltimore County Detention Center. *Id*. at 41-42, 51. Detective Requer stated that he did not "assist"

Gaskins in having his handgun charge placed on the inactive docket.  *Id*. at 50.

Gaskins, consistent with his prior statement, testified that, three days after the Booker murder, Batty told him that he shot and killed Booker.  *Id*. at 158-59.  On cross-examination, Gaskins flatly denied that he exchanged his testimony for promises of leniency on the armed robbery charges.  *Id*. at 161-65.  Nevertheless, defense counsel made strong efforts to suggest that Gaskins hoped to receive additional consideration on his armed robbery charges in exchange for his testimony.  *Id*.  On re-direct examination, Gaskins explained that he and Booker had been very close friends, and that he did not inform the police of the information he received from Batty because, at that time, he intended to seek retribution himself. Respondents' Exhibit 7 at 21-22.[2]

 After Batty was convicted, he pursued an unsuccessful appeal.  *See* Respondents' Exhibits 12-16.  Batty then filed for state post conviction relief, asserting, among other things, that the prosecution had failed to disclose fully its deal with Gaskins.  *See* Respondents' Exhibits 17-19.  At the three-day hearing on Batty's petition, the State was again represented by Carolyn Stark-Saxon, the prosecutor at Batty's trial.  Ms. Saxon addressed the *Brady* allegations in her preliminary remarks to the court:

> MS. SAXON:  Yes, and what I wanted to say is that by the time we got to trial we had developed more evidence than just Corey Gaskin's statement.
>
> In addition, at the time that Corey Gaskins was identified as a witness, he had been picked upon a handgun charge in the city and he had a VOP pending in the county.  And what happened was is he told the detectives that if they helped him with his charges then that he would give them the person

---

[2]At the close of the evidence, the trial court instructed the jury to view Gaskins's testimony with caution in its deliberations because of his apparent deal with the State. Respondents' Exhibit 9 at 16-17.

who killed Chink.  And so J.T. Brown from homicide he took that statement
and then he called in Det. Riquir.

Well at the time that this happened since he had a VOP pending in the
county we let him stay in the county because Mr. Batty was in the Baltimore
City jail and we didn't want them housed in the same place all-right.

So, when I got involved in the case and talked to him and found out
what happened we told him look we want you to stay in the county and we will
ask that anytime that you spend in the county because he knew that the robbery
charges that he was going to be charged with robbery, and the robbery that
we're talking about I don't know if you recall there was a man that was selling
Christmas trees on North Avenue.

THE COURT:  I remember, yes.

MS. SAXON:  And he was robbed twice in the same night.

THE COURT:  I remember.

MS. SAXON:  Corey Gaskins was involved in the first robbery not the second
robbery, and as things developed he was going to be charged with that.  We
told him we were getting involved with the charges of that.

THE COURT:  You say he was going to be charged with that.  What was he
going to be charged with?

MS. SAXON:  He was charged as one of the robbers.  It wasn't the murder.
It was just one of those -- it was the first robbery.

THE COURT:  All-right.

MS. SAXON:  But when he first talked to homicide and then he talked to us,
the thing that was pending at the time was some county matter and the
handgun charge.  Now as things developed the detectives were looking at him
as a suspect on the robberies and we said look we're not going to make a deal
with you on the robbery cases other than whatever you get on the robbery case
we will ask that the time that you serve in the county will count towards that
sentence because we kept him in the county and what happened was, the way
we were table to do that Your Honor is we ask the prosecutor in the county if

7

she would keep postponing disposition on the charge that he had there so that he would stay in the county. And he agreed to this and I put this in writing. And I also told him that we would tell the court whoever was the judge when he had the robbery charges that he had testified for us in the murder case, but that's it. Nothing more, nothing less.

The agreement was disclosed to the defense during the trial. In fact Ms. Shelton argued in her opening statement that Corey Gaskins was a witness, that he had made a deal, that we had made a deal regarding these charges and so forth. And she thoroughly cross examined him on this point.

In any event, I just wanted to say that there was a lot more to this case that we did not enter into an agreement at all regarding the disposition of the robbery charges. We in no way ever said that we would ask that those charges would be dismissed or that they would go away and --

MS. WAITE: Your Honor can I suggest that what she's doing is testifying now and I don't think that's appropriate.

THE COURT: She's arguing Ms. Waite.

MS. WAITE: Well she's saying we and I don't think that's appropriate.

THE COURT: Ms. Waite please sit down. Go on.

MS. SAXON: I'm saying that the evidence will show that Your Honor. Also Your Honor as you review the record you'll see that Ms. Shelton did get into the case late but she requested a postponement. She requested a postponement for time to prepare, and on the trial date she was ready to go forward and in fact went forward and had filed several motions, one of which was a Hicks motion.

There were some pretrial motions. She was well prepared and her theory of the case was not alibi it was that Charles Robinson was the killer and not her client and she went forward with that aspect of the case and in fact it was to her advantage strategically to allow the information about Charles Robinson to come in and –

THE COURT: You mean Charles Robinson's statement to the police officer.

MS. SAXON: Well the information that Det. Laquer [sic] provided in trial it was to her advantage.  No the statement didn't come in.  It was just some questions that Det. Laquer [sic] answered in the trial regarding Charles Robinson.

So, Your Honor this was a hard fought case that went on for a few days. As hard as I was fighting at prosecuting she was fighting just as hard to defend him.  He was there throughout the whole trial, his family was there throughout the whole trial and the fact of the matter is he was convicted.  And, in fact, they weren't real happy about that.

And the evidence will show that when Corey Gaskins was sentenced I went to the court to make sure that he got credit for the time that had been served in the county and to let the court know that he had been cooperative with us and Ms. Shelton was there.  She can explain why she was there, but she was there and I suspected they were there to make sure we didn't do something else and we didn't.  We didn't touch the charges.

And the evidence will also show the Corey Gaskins had given a statement to the police about the Christmas tree case and that no one had ever told him that those charges were going away.  Now I don't believed Ms. Waite told you but Corey Gaskins is now deceased.  He was killed October, 1998 so you will not be hearing testimony from him.

And I suggest to you also that when Mr. Montemarano testifies you won't ever hear that he talked to me.  And you will also hear when he testifies that when he came in here, went into the court, and was rattling all these sabers and alleging all this prosecutorial misconduct he then proceeded to plead his client out, and Corey Gaskins pled guilty, they worked out a sentence, and he left.  On the record, in essence he said well that the public defender's office would have to just worry about their own post conviction.  He was worried about his client.

So, this is not exactly what it appears.  It was a well tried case.  It was a hard fought tried case and the family was there, and the defendant was there, and all the stuff that they're talking about never came up.

*See* Transcript of April 4, 2001, at 16-21.

With regard to his *Brady* claim, Batty presented two witnesses, Michael

Montemarano, Esquire, who represented Gaskins on his charges for armed robbery, and

Angela Shelton, who represented Batty at trial.  Mr. Montemarano testified that Gaskins

communicated to him that he was told by the State that he would not be "charged" in the

armed robbery cases if he testified favorably in Batty's case.  *See* Transcript of April 4, 2001,

at 112.  Gaskins further told Montemarano that he agreed to be held in Baltimore County

until after he testified in the Batty case.  *Id*. at 113.  During his testimony, Montemarano read

an excerpt from an August 19, 1996, letter he received from Gaskins, wherein Gaskins

suggested that any promise to drop the armed robbery charges was based on his cooperation

in the armed robbery case, as opposed to Batty's trial:

> Homicide pulled me in about the crime and said Thomas Bradley told them I
> did it.  Homicide said I was not going to be charged if I told them what
> happened.  I was already on a murder case and Det. Ritz said I could help
> myself even more if I told them who was on the robbery with me.  I was under
> the impression I was not going to be charged because that's what they said.
> They recorded my statement then they charged me.  The recorded statement is
> all the evidence they have.  I would like the evidence suppressed on the
> grounds that they lied to me and my fiancé and promised me something I
> didn't get.

*Id*. at 114.[3]  The letter, admitted into evidence as Petitioner's Exhibit Number 6, went on to

state, however, that he received assurances from Detective Requer and Carolyn Stark-Saxon

that "things were going to be okay."

Referring to his notes, Mr. Montemarano stated that Mr. Gaskins told him that, in

reference to the armed robbery charges, "[h]e had been told by the detective and the detective

---

[3]Gaskins acknowledged in his statement to the police that he was motivated to provide
his account of his participation in the first armed robbery as a show of good faith that he was
not involved in the second armed robbery, which resulted in a homicide.  *See* Exhibit B to
Petitioner's First Supplemental Petition at 15.

told the prosecutor Carolyn Saxon that he would not be charged.  He would get nothing more than time served.  He remembers signing something in Ms. Saxon's office. . . .  He wouldn't be charged with robbery because he was helping him with regard to the murder case."  *Id*. at 115-16.  Gaskins re-stated in a letter dated September 6, 1996, that he expected that the armed robbery charges would be dropped.  *Id*. at 116-17.  Mr. Montemarano testified that he never discussed the matter with Ms. Stark-Saxon.  *Id*. at 117.

According to Mr. Montemarano, when Gaskins's matter convened at the November 26, 1996, hearing, the Assistant State's Attorney, Ahmet Hissim, "wanted to strike a less lenient resolution tha[n] I was prepared to see happen."  *Id*. at 118.  Mr. Montemarano testified:

> As I made clear on the record at the bench conference with Mr. Hissom and Judge Smith if there was not a resolution that my client could live with then and there that we were going to get a new trial date and I was going to issue subpoenas from all of the pertinent individuals from Towson, the Baltimore City Police Department, and the City State's Attorney's Office.

*Id*.  Ultimately, the State offered a resolution acceptable to Gaskins, and a plea was entered.  *Id*. at 120.  Mr. Montemarano conceded on cross-examination that the charges against Gaskins were not dismissed; in fact, Gaskins was not only required to serve some additional time in prison, but he also accepted a substantial suspended prison term.  *Id*. at 122.

Angela Shelton testified on numerous aspects of Batty's case.  With regard to the alleged *Brady* violation, she acknowledged that the State disclosed Gaskins as a State's witness.  *See* Transcript of April 9, 2001, at 19, 59-61.  Additionally, several letters Gaskins wrote to Detective Requer were made available to her during the trial.  *Id*. at 25-27.  Shelton possessed the written plea deal signed by Gaskins, Detective Requer, and Ms. Stark-Saxon.

Although she indicated that she believed that there was more to the State's deal than was disclosed, such as additional assistance on robbery charges, she added that "nothing was going on" that she could find. *Id.*

On cross-examination, it was exposed that Ms. Shelton, although summonsed by the State,[4] refused to meet with the State prior to the post conviction hearing despite several requests. *Id.* at 53-57. Ms. Shelton stated that she considered Gaskins to be "an opportunist," which is what she attempted to convey to the jury through cross-examination. *Id.* at 73-74. Ms. Shelton explained that, although she suspected that there was more to the deal than what was disclosed to her, she never found "anything specifically" to confirm her suspicions. *Id.* at 74. She testified that she attended Gaskins's November 26, 1996, plea hearing to make sure that there was, in fact, no evidence of an undisclosed deal. *Id.* at 74-76.

After the close of the evidence, the court granted Batty's post conviction counsel's request to submit written closing argument. With regard to the *Brady* claim, Batty asserted that the evidence showed "that Mr. Gaskins had an unwritten undisclosed agreement - with regard to the armed robbery of two men he committed on Christmas Eve 1994 - that he would not be prosecuted if he testified against Mr. Batty." Respondents' Exhibit 21 at 8; *see also id.* at 10 (". . . Mr. Gaskins still had an understanding that the 'robbery charges that are presently pending against him' would never be filed.") and 16 ("The evidence shows that Mr. Gaskins clearly expected to not be charged for the Christmas Eve robberies and, if charged, to receive no time."). According to Batty, the fact that Gaskins received "essentially" time-served in the armed robbery cases, supported the *Brady* claim. *Id.* at 13.

---

[4] Ms. Shelton was also summonsed by Batty. *Id.* at 56.

12

The post conviction court ultimately concluded that Batty failed to show any evidence of an undisclosed deal to drop the charges, stating that "there was no evidence of anything other than the actual plea agreement made between the State and Corey Gaskins and that was disclosed." Respondents' Exhibit 22 at 5-6. In his application for leave to appeal the state post conviction court's ruling, Batty again argued that "[t]he unwritten undisclosed deal involved a promise to Mr. Gaskins that he would not be prosecuted for a Christmas Eve 1994 armed robbery during which he robbed two men while brandishing a weapon." Respondents' Exhibit 23 at 3. Batty's application for leave to appeal was denied summarily by the Court of Special Appeals of Maryland. *See* Respondents' Exhibit 24.

<u>REASONS FOR DENYING RELIEF</u>

A.    **Batty's Claims That The Prosecution Violated *Brady* By Failing To Disclose That, In Exchange For His Testimony Against Batty, Gaskins Would Receive a Direct Benefit In His Pending Escape Case And Assistance On His Handgun Possession Charge Should Be Rejected As Both Procedurally Defaulted And Meritless.**

In state post conviction proceedings at the circuit court and appellate levels, Batty argued that the prosecution failed to disclose the full extent of its agreement with Gaskins. The sole premise of Batty's argument was the prosecution's alleged failure to reveal an unwritten promise to Gaskins that it would <u>drop</u> two armed robbery charges against Gaskins if he testified for the State in Batty's trial. Respondents' Exhibit 21 at 8 ("But the evidence clearly shows that Mr. Gaskins[] had an unwritten undisclosed agreement - with regard to the armed robbery of two men he committed on Christmas Eve 1994 - that he would not be prosecuted if he testified against Mr. Batty."); *Id*. at 16 ("The evidence shows that Mr. Gaskins clearly expected to not be charged for the Christmas Eve robberies and, if charged,

receive no time."); *Id*. at 17 ("Mr. Gaskins <u>agreed to testify</u> on the condition that the Christmas Eve robbery charges would be "dropped."); Respondents' Exhibit 23 at 3 ("The unwritten undisclosed deal involved a promise to Mr. Gaskins that he would not be prosecuted for a Christmas Eve 1994 armed robbery during which he robbed two men while brandishing a weapon."); *Id*. at 4 ("Mr. Gaskins made a concerted effort at his guilty plea hearing before Judge Smith to put on the record, through counsel Michael Montemarano, that he testified in the murder trial against Mr. Batty on the basis that the charges against him for the Christmas Eve armed robbery would be dismissed."); *Id*. at 10 ("... Mr. Gaskins still had an understanding that the 'robbery charges that are presently pending against him' would never be filed."); *see also* Transcript of April 4, 2001, at 9-10 (post conviction defense counsel, referring to the armed robbery charges and stating that "[t]he evidence will show that Mr. Gaskins ended up with an unwritten and undisclosed deal with the State that all of his charges would go away if he testified against my client.").  In state proceedings, Batty did not advance any evidence related to an undisclosed deal regarding the disposition of his handgun and escape charges.  Because they were never raised in, or considered by, the state post conviction court, and the time for doing so has expired, Batty's current claims that the prosecution violated *Brady* by failing to disclose that Gaskins would receive a direct benefit in his Baltimore County escape case and his Baltimore City handgun possession case are procedurally defaulted.  *See* Respondents' Original Answer at 9-10 (citing caselaw which requires that habeas petition present both the same legal claims and the same supporting facts to each of the appropriate state courts and applying procedural default to claims not raised where presentation of the claim would now be fruitless).

Even if not defaulted, these claims would fare no better on the merits.  To establish

14

a *Brady* violation, Batty must first prove, as a threshold matter, that the prosecution suppressed or withheld evidence. *United States v. Bagley*, 473 U.S. 667, 674-78 (1985). Neither in state court nor here has Batty met this initial burden.

The trial record confirms that Batty's defense fully understood that Gaskins sought assistance on his Baltimore County escape charge and his Baltimore City handgun charge when he requested to speak with the police after his January 25, 1995, arrest.[5] Gaskins offered to provide information to the police about Booker's murder in exchange for consideration on these two charges. Respondents' Exhibit 6 at 157; Respondents' Exhibit 7 at 16-18; *see also* Respondents' Exhibit 20. The police told Gaskins that they could make no promises but that his cooperation would be communicated to the respective prosecutors. *See id*. On the basis of this representation, Gaskins gave the statement, which implicated Batty in Booker's murder. *See id*.

Prior to Batty's trial, Gaskins's handgun charge was placed on the stet docket, and the Batty defense was fully informed of this fact. Respondents' Exhibit 6 at 161. During her cross-examination of Gaskins, defense counsel made sure that the jury knew of the disposition of Gaskins's handgun charge. *Id*.; *see also* Respondents' Exhibit 9 at 35 (defense counsel's closing argument wherein she states the following: "But remember, ladies and gentlemen, when he's first arrested he wanted some help with his handgun charge, and that

---

[5] In his First Supplemental Petition at page 20, Batty concedes that "[t]he State made clear that any possible leniency pertained exclusively to the handgun and escape from home monitoring charges." On page 23, he further acknowledges that, "with respect to the handgun possession and violation of home monitoring charges, the police had promised to bring Gaskins's cooperation to the attention of the State's Attorney for possible lenient treatment on those charges."

recommendation resulted in those handgun charges being stetted, placed on the inactive docket."); Transcript of April 4, 2001 at 16-21 (prosecutor informing court during opening statement that, at the time Gaskins gave his statement to the police, he had a handgun charge pending and a VOP in the county and that the prosecution had informed the defense that it would tell the Court that Gaskins had been cooperative with us on those charges, on the handgun charge and the VOP). Given that any benefit to Gaskins on the handgun charge accrued prior to Batty's trial, it cannot be said such benefit was made in exchange for Gaskins's testimony in Batty's case. And, in any event, the record shows full disclosure with regard to this charge and its disposition.

Similarly, the record confirms that the Batty defense knew of Gaskins's Baltimore County escape charge and that Gaskins requested assistance on this charge in exchange for his statement implicating Batty. Respondents' Exhibit 6 at 36-37, 58-59,156-57. The defense knew further that the officers who took the statement agreed to inform the prosecutor of Gaskins's cooperation in Batty's case. *Id*.

At the plea hearing held on April 25, 1995, disposition in Gaskins's escape case was postponed. *See* Exhibit A to Petitioner's Second Supplemental Petition. Batty suggests this postponement was to insure that Gaskins testified favorably for the State at Batty's homicide trial and that this fact was not disclosed by the prosecution. The record shows, however, that disposition in that case was postponed simply so that Gaksins could be held in the Baltimore County Detention Center instead of being held in Baltimore City, where Batty was being housed pending trial, and that Batty's defense was aware of this. Respondents' Exhibit 6 at 58-59; Transcript of April 4, 2001, at 16-21. If Batty believed that postponement of disposition in the escape case was useful impeachment evidence, he could have, and should

16

have, used that evidence at trial. The fact that neither Batty's trial counsel nor his post conviction counsel ever alleged any impropriety in this regard is proof enough that no impropriety occurred.

### B. The Prosecution Did Not Fail To Disclose Leniency to Gaskins On His Armed Robbery Charges In Exchange For His Testimony.

Batty tacitly acknowledges, *see* First Supplemental Petition at 25 n. 9, that his claim that the State failed to disclose promised "leniency" on Gaskins's armed robbery charges is much broader than the claim raised previously in state court. As this Court noted in its February 14, 2005, Memorandum and Order, Batty's claim in state court was whether the State failed to disclose that, in exchange for his testimony against Batty, "Gaskins <u>would not be charged</u> in connection with a robbery committed in Baltimore City on December 24, 1994. . . ." Memorandum at 24 (emphasis added). Under the circumstances, Gaskins is limited to pursuing this claim. Any additional argument now asserted by Batty not previously raised in state court is procedurally defaulted. *See* Respondents' Original Answer at 9-10 (citing caselaw which requires that habeas petition present both the same legal claims and the same supporting facts to each of the appropriate state courts and applying procedural default to claims not raised where presentation of the claim would now be fruitless).

Batty raises no basis for relief in any event. It is beyond dispute that, in June of 1995, Gaskins was charged with two counts of armed robbery based on events that occurred on December 24, 1994. In the face of prosecution on these more serious charges, Gaskins pled guilty on November 26, 1996, to two counts of robbery. Thus, as the state post conviction court properly concluded, there is simply no evidence of an undisclosed deal whereby the State, in exchange for Gaskins's testimony in Batty's case, agreed to drop Gaskins's armed

robbery charges. *See* Exhibit E to Petitioner's First Supplemental Petition (Letter from Debra Michael, Assistant Public Defender, to Michael Montemarano, wherein Michael states that she was "not under the impression that Mr. Gaskins's city charges would be dropped.").

Batty's broader claim, that there was an undisclosed deal for leniency is similarly meritless. The transcript of Gaskins's plea refutes the notion that the State was in any way seeking to fulfill an undisclosed promise to reward Gaskins for his testimony in Batty's homicide trial. In fact, the opposite is true. At Gaskins's November 26, 1996, plea hearing, the prosecutor, Ahmet Hisim, denied the existence of the deal outlined to the court by Mr. Montemarano:

> There is no evidence though from my perspective as a prosecutor – I have nothing in any statement by Mr. Gaskins that I have been given as to this other homicide or any deals that were made with Mr. Gaskins. . . . The only thing I have, information about any deal, are a memo from Ms. Saxon and Detective Requer, who said they would come in and testify. Now, I do have to say that Ms. Saxon did want the court to know that if it wasn't for Mr. Gaskins, she wouldn't have gotten a conviction, and she claims that Mr. Gaskins risked his life to testify in that case.

Respondents' Exhibit 20 (transcript of November 26, 1996, hearing) at 7.

The plea hearing record shows that Mr. Montemarano threatened to lengthen and complicate Gaskins's armed robbery trial by conducting a full scale inquiry into what the State promised Gaskins in exchange for his testimony in the Batty homicide trial. *Id.* at 11, 17, 20-22. Mr. Montemarano further proffered that he expected to obtain suppression of Gaskins's statement to the police, wherein Gaskins admitted to participating in the armed robberies. *Id.* at 4-8. Thus, it is clear that, if Gaskins's case went to trial, the defense intended to engage the State in an intense battle on multiple fronts.

Mr. Hisim was forced to weigh these factors against substantial weaknesses in the

State's case against Gaskins.  First, one of the two victims of the armed robberies was dead.  *Id*. at 9.  Second, the one surviving victim had not communicated an ability to identify Gaskins as the assailant.  *Id*.  Third, the lead detective who investigated the case was unavailable  due to neck surgery.  *Id*. at 10.  This is confirmed in the following exchange:

MR. HISIM: The problem is, is that the two victims in those two cases –

THE COURT: One of them is dead.

MR. HISIM: One of them is dead.  And in that case, could I call them, and I said, well you know, he gave us this information.  They go, yes, but why should that be any benefit to him.  I said, well, maybe it has been, but we still think he should get time.

THE COURT: Well, do you have an idea on it?

MR. HISIM: I don't know if the man can identify him.  I haven't been given any information as to whether he can identify him.

THE COURT: So all you have is his statement.

MR. MONTEMARANO: And I'm making the request that he be kept out of the courtroom.

THE COURT: Now I understand why you said that.

MR. MONTEMARANO: Right.  I'm not as dumb as I look, Judge.

MR. HISIM: I understand –

MR. MONTEMARANO: Hicks doesn't run until the first week in March.  We can get a date certain before then.

MR. HISIM: I understand the point why we can give up this date because that was my first question when I read the file.  I called Carolyn up and go, all right, tell me what's going on.  One of my problems is that the detective who took the statement and the writ, he had neck surgery this past Christmas and he had to go back in for them to redo the neck surgery.

[MR.] MONTEMARANO: Who?

MR. HISIM: So I can't talk to him.  I can talk to Detective Covington.  I don't know how much you know about the detectives down at Homicide but there are certain detectives that I know I can get information from and there are other detectives that whatever they tell me, I'm not going to waste my time. I would like to talk to Detective Ritt (ph.) and find out what he says.

*Id*. at 9-10.

Without any competent witnesses that could identify Gaskins, without access to an officer that investigated the case, and with the possibility that Gaskins's statement to the police would be suppressed, Mr. Hisim had every reason to enter plea negotiations. Ultimately, the State did agree to reduce the armed robbery charges to simple robbery and submit to two, concurrent, seven-year sentences, with all but three years suspended, with credit for time-served, and with two years probation.  But, as Mr. Montemarano explained to the court, this deal adequately served the objectives of both sides:

> In my view, that puts him out on the street almost immediately on the three, which is what he wants.  It hangs some serious time over his head, which is what Mr. Hisim wants, and limits the time he has to be on probation. . . . It makes his guidelines, if he ever gets in trouble ever again for the rest of his life, so bad that it's not even funny.  We are talking double digits (inaudible) accepted the fourteen.

*Id*. at 28-30.

Batty wrongly asserts that the armed robbery disposition "played out consistently with Gaskins's understanding that, in exchange for his testimony against Batty, he would be treated favorably on the armed robbery charges." First Supplemental Petition at 26.  As noted above, it was Gaskins's position that the State promised to <u>drop</u> the armed robbery charges against him.  The State clearly did no such thing.  The State's plea negotiations were dictated

by the state of the evidence against Gaskins, which was compromised significantly by the factors set forth above.  Ultimately, Gaskins pled guilty to two serious crimes.  Also, given the substantial suspended portion of the sentence, Gaskins faced severe additional consequences if he committed any future criminal activity or violated the terms of his probation.  Certainly, this was not the equivalent of a nolle prosequi, which is what Gaskins alleged he was promised by the State.

In denying Batty's *Brady* claim, the state post conviction court ruled that "there was no evidence of anything other than the actual plea agreement made between the State and Corey Gaskins and that was disclosed."  Respondents' Exhibit 22 at 5-6.  Batty characterizes the state post conviction court's ruling as "short-shrift" and as misrepresenting "the facts as presented as the State Post-Conviction Hearing."  First Supplemental Petition at 3.  And, this Court has stated "the summary rejection in one sentence by the post conviction court of the prosecutorial misconduct claim provides an inadequate basis for determining whether that court's finding was contrary to, or involved an unreasonable application of, clearly established federal law."  Memorandum at 26.  However, simply because the state post conviction court disposed of Gaskins's claim summarily does not mean the decision was perfunctory.

In fact, the record shows that the court rejected Batty's *Brady* claim after giving it due consideration.  Testimony at Batty's post conviction hearing occurred over three separate days.  As set forth above, Batty argued to the court that the prosecution failed to include an unwritten, undisclosed promise that Gaskins's armed robbery charges would be <u>dropped</u> if he testified in Batty's case.  At the outset of the hearing, Carolyn Stark-Saxon, who was also the prosecutor at Batty's trial, stated to the court that there was no undisclosed deal with

Gaskins regarding the armed robbery charges. Batty did not call Ms. Saxon as a witness and cross-examine her as to these assertions, nor did he call Detective Requer, the other party to the agreement, who was still alive.[6] Batty chose instead to rely on the testimony of Mr. Montemarano and Ms. Shelton. Mr. Montemarano had no first-hand knowledge of the deal between the State and Gaskins. Rather, his knowledge came exclusively from his communications with Gaskins. Ms. Shelton testified that, although she believed there was more to deal than the State disclosed, she never found any specific evidence of any impropriety – and she was present at Gasksins's plea hearing. *See* Transcript of April 9, 2001, at 74-77. This testimony alone thoroughly undermined Batty's argument that the resolution of Gaskins's armed robbery charges evidenced an unwritten and undisclosed deal between Gaskins and the State.

Additionally, Gaskins's letters to Detective Requer and Mr. Montemarano do not constitute credible evidence of prosecutorial misconduct. In fact, the March 3, 1995, letter, which was cited consistently as evidence of the undisclosed deal, was drafted before Gaskins was even charged with the Baltimore City armed robbery. *See* Respondents' Exhibit 20. Later, in a letter dated June 22, 1995, Gaskins acknowledged that Detective Requer "didn't promise [him] anything. . . ." *See* Respondents' Exhibit 20. The letters reveal that Detective Requer was not engaging Gaskins in any dialogue regarding his pending charges, much less implying that Gaskins would receive leniency on these charges in exchange for his testimony in Batty's case. Moreover, the letters further reveal Gaskins's frustration that his confession in the armed robbery case did not result in the dismissal of those charges.

---

[6] Gaskins died before the post conviction hearing.

22

The state post conviction court was entitled to reject Gaskins's claims as fabrication, self-serving attempts to bolster his plea bargaining position in the armed robbery case, and/or an unilateral subjective expectation of leniency. *See, e.g., Adams v. State*, 165 Md. App. 352, 416-17, 885 A.2d 883 (2005) (explaining that *Brady* does not cover a witness's unilateral subjective expectation of leniency), *cert. denied*, 391 Md. 577, 894 A.2d 545 (2006). What remained was unequivocal evidence provided by Gaskins and Detective Requer at trial that there was no undisclosed deal between the State and Gaskins. This evidence was further corroborated by Ms. Saxon's opening remarks to the post conviction hearing, indicating that the memorandum agreement constituted the entire agreement between the State and Gaskins. Given that Batty failed to argue, much less show, that the State surreptitiously offered Gaskins "leniency" on his armed robbery charges in exchange for his trial testimony, the denial of post conviction relief was proper because Batty was not entitled to relief under *Brady*. Batty now raises no basis under 28 U.S.C. § 2254(d) to upset this ruling.

### C.    Materiality

As the Supreme Court noted in *Bagley*, 473 U.S. at 682, to prevail on a *Brady* claim, a defendant, having proved that favorable evidence was suppressed by the State, must also prove that the evidence suppressed had a material affect on the outcome of the case. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id. Accord Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). Batty's current *Brady* claims also fail this threshold.

The record shows that, at Batty's trial, defense counsel immediately challenged the credibility of Gaskins in her opening statement:

 So ladies and gentlemen, the State agreed to make favorable recommendation to Corey Gaskins for this information that he gave out of the blue on January of 1995. It wasn't until after he was arrested that he said he wanted to make some kind of deal. He wanted to look out for himself.

. . .

I ask that you listen to Corey Gaskins. His credibility, ladies and gentlemen, I submit to you that he has none, but that will be the determination that you make.

. . .

Corey Gaskins, dealmaker, was arrested and only interested in looking out for himself. There is nothing to back him up.

Respondents' Exhibit 4 at 55-57.

Defense counsel further challenged Gaskins's credibility through cross-examination, which included the following exchange:

MS. SHELTON: And on this particular day when you were arrested on January 25th of 1995 and you told Detective Requir you wanted help with your charges, your pending handgun charges, that was placed on an inactive docket, isn't that correct?

GASKINS: Yes.

MS. SHELTON: And then you had pending robbery charge come up and you wanted help with that, isn't that correct.

GASKINS: Yes, ma'am.

MS. SHELTON: And before you testified in court today, didn't you want in writing some reassurances that they were going to help out further with those charges you had pending?

GASKINS: No, ma'am.

. . .

MS. SHELTON: The pending robbery charge, to help with your pending charge you have with Baltimore City, the robbery charge, robbery with a

24

dangerous and deadly weapon.  You wanted help for that charge so in exchange for their helping you with that particular charge, you were going to come in her and testify, is that correct?

GASKINS: No, ma'am.

MS. SHELTON: Mr. Gaskins, you approached homicide because first of all, the handgun charge.  You knew that possession of a handgun carries a penalty of incarceration, is that correct?

GASKINS: Yes.

MS. SHELTON: You didn't want to go to jail.

GASKINS: No.

MS. SHELTON: And robbery with a dangerous and deadly weapon, state of Maryland, Baltimore City, that carries a maximum penalty of 20 years, isn't that correct?

GASKINS: Yes.

MS. SHELTON: And you don't want to go to jail for 20 years either.

GASKINS: Can I say something?

MS. SHELTON: Yes, or no, you don't want to go to jail for 20 years.

GASKINS: No.

Respondents' Exhibit 6 at 161-62.

After the close of the evidence, the trial court instructed the jury to regard Gaskins's

testimony with caution:

Corey Gaskins testified, and it was indicated by the evidence, that the State had promised to bring his cooperation in this case to the attention of the judge in the case he had pending against him at the time he gave the statement to the police and testified in this case against this Defendant.

25

Now, under the circumstances, the law requires you to consider that testimony with caution because the testimony may have been colored by a desire to gain favor from the State of having the State tell the Judge that he cooperated in this case. To gain that favor by testifying against the Defendant. So the law requires you simply to view that with caution.

Respondents' Exhibit 9 at 16-17.

In closing argument, defense counsel again reminded the jury to view Gaskins's

testimony skeptically:

Let's examine Mr. Gaskins's statement. Now the State would have you believe that, well, we're just going to make a recommendation. But remember, ladies and gentlemen, when he's first arrested he wanted some help with his handgun charge, and that recommendation resulted in those handgun charges being stetted, placed on the inactive docket. He wasn't prosecuted for it.

Then bigger things come up. I want something in writing and I want it the day before I'm going to testify. They said, well, we'll recommend that you be given credit for any time that you served on a detainer. Ladies and gentlemen, Mr. Gaskins has been in the system and he knows if he's serving time on that detainer, he's entitled to that time by law, but the State will make a recommendation. That's in writing. That's for your sake. But he knows that he's the one to get a favorable recommendation because he has now a robbery deadly weapon charge pending and he doesn't want to go to jail for 20 years.

. . .

And then Corey Gaskins comes in with this incredible tale where the only thing missing is once upon a time and we all live happily ever after because he wants to be the one to live happily ever after with the State's recommendation when he goes before whatever judge for his robbery deadly weapon offense.

*Id*. at 35-39.

Thus, at trial, the jury knew that Gaskins sought assistance in his handgun and escape

charges in exchange for the information he provided the police with regard to the Booker

homicide. The jury knew about the armed robbery charges and that Gaskins and the State

26

had entered into a written agreement with regard to his testimony in Batty's case. The defense repeatedly cited this evidence in its attempt to portray Gaskins as an opportunist, who was assisting the prosecution only to better his own situation. Even though it was not part of the agreement, defense counsel specifically suggested that Gaskins's deal with the State included assistance on the armed robbery charges. And, because of his deal with the State, the jury was instructed by the trial court to view Gaskins's testimony with caution, and the jury undoubtedly followed this instruction in deciding what weight to give that testimony.

Ultimately, despite the defense best efforts to impeach Gaskins, there remained, in the context of the trial, ample basis for the jury to believe that what Gaskins stated he was told by Batty was an accurate portrayal of the Booker homicide. First, Gaskins testified that Booker was his close friend, and thus, he had every reason to assist the State in bringing his friend's killer to justice. Second, Gaskins's account of Batty's confession revealed details of the homicide that were fully consistent with the testimony of other trial witnesses. Booker's brother testified that the masked assailants emerged from an alley near the intersection of Lucille Avenue and Beaufort Avenue. Other witnesses placed Batty in the vicinity of the murder at the time it was committed while wearing clothing that closely matched the clothing worn by Booker's attackers. Moreover, there was uncontradicted evidence that Batty twice visited Booker's home on the day of the murder. The second of these visits was just after Booker was murdered, and, at the time of this visit, Batty was wearing a bullet proof vest. Irene Degross testified that she observed Booker's assailants run directly from the crime scene into the home of Sharon Walker, Batty's girlfriend.[7] Gaskins's

---

[7]Batty, in fact, was identified as a suspect in the case on December 17, 1994, Exhibit 5 at 125-26, only four days after the murder and long before Gaskins was interviewed by the

testimony that (1) Batty told him he had visited Booker earlier in the day and was returning to Booker's house because Booker told him to do so, and that (2) Batty told him he approached Booker's car from an alley and fired multiple shots into the car was credible in the context of the other evidence and was presumably weighed as such by the jury.[8]

Batty's current allegations relating to the alleged non-disclosure by the State relate to the exact same handgun, escape, and armed robbery charges that the Batty defense team used to undermine Gaskins's credibility.  At best, Batty now sets forth only marginally different impeachment evidence from what was actually presented by the defense at trial.  There is simply no reason to believe that marginally different impeachment evidence would have altered the jury's assessment of Gaskins's trial testimony, much less caused the jury to reach a different verdict.  Batty is therefore entitled to no relief on his current *Brady* claim.  *See Strickler v. Greene*, 527 U.S. 263, 295-96 (1999) (no showing of materiality under *Brady* where petitioner failed to show that there was reasonable probability that conviction would have been different had evidence been disclosed).

---

police.

[8] Batty makes much of the fact that the State elicited testimony from Larry Mankley, which placed Batty near Mankley's house at the time of the murder, which was two blocks from where the shooting occurred.  Mankley's testimony on this point was discredited by another State's witness, Detective Fred Jackson.  Respondents' Exhibit 8 at 53-63. Specifically, Mankley, referring to his prior testimony, told Detective Jackson: "Fuck y'all. I seen the shit happen right in front of me, and I ain't telling them shit.  My name's Bennett and I ain't in it.  I ain't telling them nothing."  *Id.* at 56.  Further undermining the credibility of Mankley's testimony was the testimony of Sharon Walker, Batty's girlfriend, who stated that she was near Mankley's house at the time of the murder, and that she had not seen Batty that day.  Respondents' Exhibit 5 at 58-62.

CONCLUSION

Batty had a full and fair opportunity in state court to present his instant claims that the State violated *Brady* by failing to disclose an unwritten deal with Gaskins. The state post conviction court's ruling denying Batty's *Brady* claim was a correct ruling based on the evidence and argument presented in state court and certainly was not an unreasonable application of prevailing Supreme Court law. Accordingly, for the foregoing reasons, and for the reasons stated in Respondents' Original Answer, and without holding a hearing,[9] this Court should deny the petition for a writ of habeas corpus filed by Petitioner Louis Batty.

Respectfully submitted,

J. JOSEPH CURRAN, JR.
Attorney General of Maryland

_____/s/_____
EDWARD J. KELLEY
Assistant Attorney General
Bar No. 27039

Office of the Attorney General
Criminal Appeals Division
200 Saint Paul Place
Baltimore, Maryland  21202
(410) 576-7964 (telephone)
(410) 576-6475 (telecopier)

Counsel for Respondents

---

[9] *See Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000), *cert. denied*, 531 U.S. 1095 (2001) (citing factors set out by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 312 (1963), to be considered in determining propriety of an evidentiary hearing in a § 2254 case).

29

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of October, 2006, a copy of the foregoing

Response to Supplemental Petitions for Writ of Habeas Corpus, which was electronically

filed on October 19, 2006, was mailed, first class, postage prepaid, to Michael E. Lawlor,

Esquire, Lawlor & Englert, LLC, 6305 Ivy Lane, Suite 704, Greenbelt, MD 20770.


_____/s/_____
EDWARD J. KELLEY
Assistant Attorney General